**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MARK ALSTON, | ) | CASE NO:    1:07-cv-02284 |
| | ) | |
| Petitioner, | ) | JUDGE KATHLEEN M. O'MALLEY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| ED VOORHIES, Warden, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |
| | ) | |

Petitioner, Mark Alston ("Alston"), challenges the constitutionality of his conviction in the case of *State v. Alston*, Case No. 05CR067825.  On July 27, 2007, Alston, *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.[1]  (Doc. No. 1.)  Respondent filed a Return of Writ on January 9, 2008 (Doc. No. 23) and Alston filed a Traverse on February 11, 2008 (Doc. No. 24).  This matter is before the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the Magistrate Judge recommends that the habeas petition (Doc. No. 8, 25) be **DENIED**.

### I.  Procedural History

**A.  Conviction and Sentence**

On May 12, 2005, a Cuyahoga County Grand Jury returned an indictment charging Alston with aggravated robbery, in violation of Ohio Revised Code § 2911.01(A)(1)/ 2911.01(A)(3), with a firearm specification (Count One).  (Doc. No. 23, Ex. 2.)  On May 26,

---

[1]Petitioner filed an amended petition on October 5, 2008 (Doc. No. 8) and, without seeking leave, a second amended petition on June 9, 2008 (Doc. No. 25).

2005, the Cuyahoga County Grand Jury filed a supplemental indictment charging Alston with the following additional counts: murder, in violation of Ohio Rev. Code § 2903.02(B) (Count Two); having weapons under disability, in violation of Ohio Rev. Code § 2923.13(A)(2)/2923.13(A)(3) (Count Three); tampering with evidence, in violation of Ohio Rev. Code § 2921.12(A)(1) (Count Four); and felonious assault, in violation of Ohio Rev. Code § 2903.11(A)(1) /2903.11(A)(2) (Count Five).  (*Id.*)  All four counts in the supplemental indictment included firearm specifications.  (*Id.*)

Alston pled not guilty to all counts and proceeded to trial by a jury.  (*See* Doc. No. 23, Ex. 3.)  The jury found Alston guilty on all five counts and the trial court sentenced Alston to an aggregate term of 24 years to life imprisonment.  (Doc. No. 23, Ex. 3, 4, 6.)

**B.  Direct Appeal**

Alston, represented by counsel, timely appealed his conviction to the Ninth District Court of Appeals for Cuyahoga County, Ohio ("state appellate court"), raising the following two assignments of error:

> First Assignment of Error:  The trial court committed reversible error and abused its discretion when it refused to allow a jury instruction for the lesser included offense of reckless homicide.

> Second Assignment of Error:  The conviction of Mark Alston was against the manifest weight of the evidence.

(Doc. No. 23, Exs. 7-8.)

On August 14, 2006, the state appellate court issued an opinion affirming the judgment of the trial court.  (Doc. No. 23, Exs. 1, 10.)

On September 20, 2006, Alston, *pro se*, filed a notice of appeal and a memorandum in support of jurisdiction in the Supreme Court of Ohio.  (Doc. No. 23, Exs. 12, 13.)  Alston

asserted the same two claims that he raised before the state appellate court.  (Doc. No. 23, Ex. 13.)  The state filed a memorandum in opposition on October 18, 2006.  (Doc. No. 23, Ex. 14.)  On December 27, 2006, the Supreme Court of Ohio denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  (Doc. No. 23, Ex. 15.)

**C.  Delayed Appeal and Application to Reopen**

On September 11, 2006 – after the state appellate court denied his timely direct appeal and just prior to filing his notice of appeal in the Supreme Court of Ohio– Alston, *pro se*, filed a motion for leave to file a delayed appeal in the state appellate court, asserting a claim for ineffective assistance of appellate counsel.  (Doc. No. 23, Ex. 16.)  The state appellate court interpreted the motion as both a motion for leave to file a delayed appeal and a motion to reopen the appeal pursuant to App. R. 26(B).  (Doc. No. 23, Ex. 17.)  On September 21, 2006, the state appellate court denied the motion for leave to file a delayed appeal and the motion to reopen the appeal.  (*Id*.)  Alston did not appeal from the state appellate court's judgement.

**D.  Untimely Application to Reopen**

On May 2, 2007, Alston filed a delayed 26(B) application in which he asserted the following assignment of errors:

> 1.  The trial court error in failure [sic] to show burden of proving all the elements beyond a reasonable doubt. The defendant was denied due process of law and a fair trial in violation of the Fifth, Sixth, and Eighth, and Fourteenth Amendments to the United States Constitution and in violation of Crim R. 29.
>
> 2.  The defendant was denied effective assistance of appellant [sic] counsel when appellant [sic] counsel refused to represent me by what counsel guaranteed me by the Sixth Amendment of the Constitution.

(Doc. No. 23, Ex. 20.)  As cause for the untimeliness of the application, Alston asserted that due to his indigence, he was unable to obtain a copy of the trial transcript, and that without the

transcript, he could not file a proper application.[2] (*Id.*)  On May 17, 2007, the state appellate

court denied the untimely 26(B) application.  (Doc. No. 23, Ex. 21.)  Alston did not appeal from

the state appellate court's denial of his delayed application to reopen.

**E.  Federal Habeas Petition**

On July 27, 2007, Alston, *pro se*, filed a Petition for Writ of Habeas Corpus in this Court,

asserting the following five grounds for relief:

> GROUND ONE: The conviction of Mark Alston was against the manifest weight
> of the evidence.

> GROUND TWO:  The trial court committed reversible error and abused its
> discretion when it refused to allow a jury instruction for the offense of reckless
> homicide.

> GROUND THREE: The defendant was denied due process and a fair trial when
> the trial court erred in admitting hearsay testimony.

> GROUND FOUR:  The conviction for complicity to aggravated robbery is based
> upon insufficient evidence.

> GROUND FIVE:  Due process in appeal, denied fair opportunity to present all
> issues, and denied fair review by the court.

On October 5, 2007, Alston filed an Amended Petition in which he amended Ground

Three as follows:

> AMENDED GROUND THREE:  The defendant was denied due process and a
> fair trial when the trial court erred in admitting hearsay testimony, and admitting
> inadmissible evidence.

Respondent filed a Return of Writ on July 9, 2008 (Doc. No. 23) and Alston filed a Traverse on

February 11, 2008 (Doc. No. 24).

_____

[2]Alston also asserted that he filed a timely 26(B) application in November 2006, but there
is no such filing on the docket.  (Doc. No. 23, Ex. 20.)

On June 9, 2008, with no explanation and without seeking leave, Alston filed what

purports to be a Second Amended petition asserting the following ground for relief ("Ground

Six"):[3]

> GROUND SIX: The Petitioner Alston's conviction is tainted and defective and
> his due process rights were violated in the defective indictment, in prosecution for
> aggravated robbery where the indictment omitted the required *mens rea*
> recklessness for the crime of aggravated robbery in violation of the Fourteenth
> Amendment of the United States Constitution.

(Doc. No. 25.)  In response, Respondent filed a Supplemental Return of Writ on June 18, 2008,

arguing that the new ground for relief should be denied as procedurally defaulted and,

alternatively, denied on the merits.  (Doc. No. 27.)  On July 2, 2008, Alston filed a reply to

Respondent's Supplemental Return of Writ.  (Doc. No. 28.)

## II.  Summary of Facts

The Ohio Court of Appeals set forth the following facts underlying Alston's conviction:

> On May 12, 2005, Defendant-Appellant Mark Alston was indicted for
> aggravated robbery, in violation of R.C. 2911.01(A)(1)/2911.01(A)(3), with a
> firearm specification. Appellant waived reading of the indictment and entered not
> guilty pleas to the charge and specification. On May 26, 2005, a supplemental
> indictment was filed and Appellant was charged with [murder; having weapons
> under disability; tampering with evidence; and felonious assault]. All four counts
> in the supplemental indictment included firearm specifications. Appellant entered
> not guilty pleas to all charges in the supplemental indictment, including the
> firearm specifications.
>
> On June 15, 2005, Appellant filed a pro se motion to sever his trial from
> that of his co-defendant Larry Moore. On June 17, 2005, the State filed a motion
> to consolidate Appellant's case with that of Larry Moore. On June 24, 2005, the

---

[3]Alston labels the new ground "Ground One."  It is not clear whether Alston intended this
amended petition to (1) replace Ground One of the previous petition with the newly
asserted ground, or (2) add the newly asserted ground to the five existing grounds.  As
Alston is proceeding *pro se*, the Court will construe his pleadings liberally and treat the
amended petition as asserting an additional, sixth ground for relief.

-5-

trial court denied Appellant's motion for separate trials and granted the State's motion to consolidate.

A jury trial commenced on June 27, 2005. On June 30, 2005, the jury returned its verdict and found Appellant guilty of all five charges and their corresponding firearm specifications. Appellant was subsequently sentenced to an aggregate term of 24 years to life incarceration.

\* \* \*

During the trial, the victim's girlfriend, Marla Renee Taylor ("Girlfriend"), testified to the following. Girlfriend had known Appellant and his co-defendant Larry Moore ("Jo-Jo") for about ten years. In the early morning hours of May 3, 2005, Girlfriend went to the victim's house; she arrived about 1:15 a.m. The two started watching a basketball game in the living room and she fell asleep. The victim woke Girlfriend up and she went to sleep in a bedroom with the victim. Girlfriend continued her testimony and testified that at some point during the night, she felt the victim get out of bed. She then heard the victim say in a scared tone, "wait a minute, Jo-Jo, you don't have to do it like this. I'll give you whatever you want. I got a girl in here." A few minutes later, Girlfriend saw Appellant walk past the bedroom. He returned and stared at her laying in the bed; she looked at him and got scared so she rolled over to act like she was asleep. After another few minutes, Girlfriend heard the screen door and then a gun shot. Appellant then came back into the bedroom and grabbed a cell phone. Girlfriend then got out of bed and hid in the closet. Girlfriend left the closet when she heard the victim's roommate opening the front door and Appellant and Jo-Jo going out the side door. She ran to the kitchen and the roommate was already there.

Girlfriend continued testifying to the following. The victim was lying on the kitchen floor in a pool of blood and he was gasping for air. Girlfriend called 911; the roommate left the house because he was scared. Girlfriend spoke with the police when they arrived. She was upset and initially forgot to tell them about Appellant retrieving the cell phone after the shooting and about the roommate coming home.

Girlfriend testified on cross-examination that she suspected the victim sold drugs for a living, but never asked him what he did for a living.

John Gardner, from the Ohio Bureau of Criminal Identification and Investigation ("BCI"), testified to the following for the State. Mr. Gardner testified that the bullet and casing recovered from the shooting was fired from the gun recovered by the police. He also examined the t-shirt the victim was wearing and determined that he was shot at close range, essentially an inch or less.

Mr. Gardner testified to the following on cross-examination. The

-6-

recovered gun was not checked for fingerprints, but was swabbed for DNA. The gun in question did not have a "hair trigger." In order for the gun to fire "something" needed to be on the trigger.

Mr. Gardner testified on re-direct examination that the gun at issue had to be manually cocked and someone had to pull the trigger for the gun to fire.

Donna Rose, from BCI, testified to the following for the State. She performed the gun shot residue tests on Appellant, Jo-Jo, and the victim. Jo-Jo's test revealed "[p]articles highly indicative of gunshot residue were identified on the left hand and right hand samples[.]" The victim's results showed "particles highly indicative of gun shot primer residue were identified on the left-hand and right-hand samples[.]" Appellant's results revealed that particles highly indicative of gunshot primer residue were not identified on his hand samples. Ms. Rose explained that the presence of gunshot residue indicates that a person handled something that had gunshot residue, they fired a weapon, or been near someone that has fired a weapon. She testified that if Jo-Jo held a gun at the victim's chest, it would not be unusual for both of them to test positive for gunshot residue.

Ms. Rose testified on cross-examination that a person can shoot a gun and test negative for gunshot residue.

The victim's roommate, Raymond Seagers ("Roommate") testified to the following for the State. Roommate was at his girlfriend's the night of the shooting, but returned home in the early morning hours. He arrived home via cab about 2:30 a.m. and noticed an unoccupied, running burgundy Explorer with tan trim in front of the house. He thought it was unusual that a car would be left running at that time with no one in it. Roommate proceeded to the front door, as he started to unlock the second lock he heard a "loud pow, a loud bang[]" and heard screaming. He went in the house and saw Girlfriend standing there crying. Roommate testified that he asked her what happened and she said someone just shot the victim. He went into the kitchen and saw the victim on the floor; he instructed Girlfriend to call 911. Roommate testified that he panicked and left. As he left out the front door, he noticed the Explorer was no longer in front of the house.

The State next called Dwane Henderson and he testified to the following. In the early morning hours of May 3, 2005, around 2:30-3:00 a.m., he left his house and saw Jermaine and Jeremiah Stewart and Jermaine Powell sitting outside the house in a gray Suburban. Mr. Henderson spoke with them and then went to the grocery store. As he left he heard police sirens.

Dale Laux, from BCI, testified that he tested Jo-Jo's tennis shoes and they tested positive for blood.

-7-

On cross-examination, Mr. Laux testified that he could not tell if the blood was human and that none of Appellant's clothes tested positive for blood.

Melissa Zielaskewicz, also from BCI, testified to the following. She testified that the blood on Jo-Jo's shoe was too small of a sample to obtain a DNA conclusion. She also tested a DNA swab from the gun used to kill the victim and she found that the "partial DNA profile from the swabbing of the trigger is consistent with [Jo-Jo]." The expected frequency of the profile was 1 in 3,591 individuals. Ms. Zielaskewicz testified that her conclusion that it was Jo-Jo's DNA on the trigger was to a reasonable degree of scientific certainty.

Ms. Zielaskewicz testified to the following on cross-examination. She did not have enough DNA to confirm the DNA on the trigger as Jo-Jo's but it could not be excluded as his DNA. She could not say to a reasonable degree of certainty when the DNA was left on the trigger.

Dr. Paul Matus, the Lorain County Coroner, testified that he performed the autopsy on the victim and determined that he died from exsanguinations or excessive bleeding due to a gunshot wound to the chest.

Jermaine Stewart ("J.S.") testified to the following for the State. He and his twin brother Jeremiah were together on the evening of May 2, 2005, but later separated. J.S. saw his brother again that night at Yolanda Sullivan's ("Yolanda") house; Jermaine Powell, Jo-Jo, Appellant, and George Smith were also there. The other men were talking about doing something. J.S. testified that he did not know exactly what they were talking about, but he knew it was not something he wanted to be involved in. As everyone got ready to leave the house, J.S.'s brother called him aside and J.S. told his brother to come with him. J.S. testified that he knew the others were "going to go do something bad." He knew it was something bad because they wouldn't let him hear their plans and they knew he wouldn't let his brother go if it was something bad. J.S. then grabbed his brother by the arm and made him come with him and Jermaine Powell; J.S. told George Smith that he could meet up with them later. George Smith, Appellant, and Jo-Jo left in "like a red SUV." J.S. then traveled to Mr. Henderson's house and the group spoke with him as he left his house to go to the grocery store. After Mr. Henderson left, J.S. received a phone call from George Smith ("George") asking to be picked up by the Gyro House. As J.S. was driving to the Gyro House, George called again and told J.S. to hurry up. When J.S. arrived at the Gyro House, George ran into the car and was quickly followed by Appellant and Jo-Jo; all three were talking at the same time telling J.S. to "go, go, go, go, go."

J.S. continued testifying to the following. He heard Appellant say "you shot him." To which Jo-Jo replied "no, I didn't." Appellant kept saying "yes, you did. I seen it. I seen you when you shot him." J.S. wanted to get them out of his

-8-

car, but he didn't want to make them mad so he kept driving around town. Appellant told J.S. to take him to Dayton and to other states. J.S. testified that he told Appellant he couldn't take him there because it was not his car and he did not have a driver's license. George was the only person in the car with a driver's license so he took over driving. Appellant told everyone in the car that if anything happened to Jo-Jo, he (Appellant) would come for them. J.S. testified that he remembered looking in the rear view mirror and seeing Jo-Jo crying in the back seat. As they were driving Jo-Jo called Yolanda to see if he really shot the victim because he wasn't sure if he did.

J.S.'s testimony continued as follows. It was decided that Appellant and Jo-Jo needed a hotel room. By now the group was in downtown Cleveland. They found a hotel that did not require identification to get a room and Appellant and Jermaine Powell got the hotel room. Appellant and Jo-Jo did not have any money so George gave them some money. On the way back to Yolanda's house a female called J.S.'s cell phone and asked what they did; when he asked her what she meant she told him they had killed someone. J.S. hung up the phone and told George the victim was dead. J.S. reluctantly testified that George asked him to lie for him and say that the gun just went off and that George did not leave with Appellant and Jo-Jo. J.S. originally agreed and lied to the police, but he eventually told the police the truth and what he knew about the shooting.

J.S. testified to the following on cross-examination. George told J.S. that Jo-Jo shot the victim and J.S. believed George even though George asked J.S. to lie for him. When Appellant said "you shot him" George was also in the car. George did not say anything about Appellant shooting the victim. When J.S., his brother, Jermaine Powell, and George returned to Lorain County, George called his mother. Later that morning, George, J.S., and Jeremiah and their mothers and other family members went to a lawyer's office.

On re-direct examination, J.S. testified that he was the most scared of Appellant because he acts crazy. J.S. reiterated Appellant's statements in the car about coming after anyone that told on them. Specifically, Appellant said he would "fly a helicopter into the fucking bar. I'll come get everybody." J.S. recognized Jo-Jo's voice when he responded to Appellant's statement about the victim getting shot.

Sergeant Mark Carpentiere, of the LPD, testified to the following. After conversations with George and the Stewart twins, he went to an alley behind a Discount Auto Sales and retrieved the gun previously discussed by the BCI technicians; the gun was partially buried in the dirt. Down the street from where he recovered the gun, Sgt. Carpentiere also located the Ford Explorer that was used the in the instant matter.

-9-

Sgt. Carpentiere testified on cross-examination that George told him either Jo-Jo or Appellant threw the gun from the Explorer after the shooting.

On re-direct examination, Sgt. Carpentiere testified to the following. George told him that he had purchased drugs from the victim and discovered that the drugs were bad so he was going to return to the victim's house and get his money back. George also told Sgt. Carpentiere that Appellant and Jo-Jo invited themselves along; George entered the house, Appellant and Jo-Jo followed and a confrontation occurred and a gun was shown. Sgt. Carpentiere continued his testimony saying that George informed him that he left the room where the victim was, heard a shot, and when he returned the victim was bleeding.

Officer Kevin Ishler, of the Cuyahoga Metropolitan Housing Authority Police Department, testified to the following. He was involved in Appellant's arrest and when Appellant was apprehended he was carry a bag of food and also a small bag of crack cocaine. While Appellant was in the back of Officer Ishler's police cruiser he was fidgeting around. After Appellant was removed from the cruiser, Officer Ishler found a large bag of suspected crack cocaine in the same area where Appellant was fidgeting. Officer Ishler testified that the area was checked before Appellant was placed in the car and no drugs were present.

Jeremiah Stewart ("Jeremiah"), J.S.'s twin brother, testified to the following for the State. Jeremiah was at Yolanda's house the evening of the shooting. He was with George, Appellant, and Jo-Jo when they were talking about a "lick plan." Jeremiah explained that a "lick" is a robbery. The three asked Jeremiah to participate in the lick and he told them no. George told Jeremiah the victim was the target of the lick. The group then left the house in two vehicles; Jeremiah, J.S., and Jermaine Powell in one car and George, Jo-Jo, and Appellant in a burgundy Explorer or Jimmy. Jeremiah, J.S., and Jermaine Powell went to Mr. Henderson's house and spoke with him until George called and asked to be picked up at the Gyro house. Jeremiah testified that when they arrived at the Gyro House, George, Jo-Jo, and Appellant were running towards the car and they seemed "scared." While in the backseat, Appellant faced Jo-Jo and said "you shot him." George told Jeremiah that Jo-Jo shot the victim. Jeremiah continued his testimony and described the remainder of the evening in the same manner as J.S. had previously.

On cross-examination, Jeremiah testified that George told him the shooting was an accident and that the gun went off when the victim hit it with his hand.

Jermaine Powell ("Jermaine") testified to the following for the State. He was at Yolanda's house the night of the shooting. He attempted to enter the basement where the rest of the men were having a conversation and he was

-10-

instructed to stay upstairs. Jermaine testified to the same events already testified to by J.S. and Jeremiah. He also testified that Appellant, George, and Jo-Jo admitted a gun had been pointed at the victim and they claimed that the victim some how hit the gun and it fired.

Detective Edward Bermudez of the LPD testified to the numerous photographs he took of the crime scene and the evidence collected. Det. Bermudez was involved in the recovery of the Explorer and found several pieces of paper with Yolanda's name on it in the vehicle.

Detective Steyven Curry of the LPD testified to the following.  He obtained George's cell phone records and they revealed that he called the victim twice before the homicide and that he called the twins twice after the homicide. Det. Curry also confirmed Roommate's statement that he arrived home via cab around 2:30 a.m. Det. Curry testified that George never denied being present when the victim was shot. Det. Curry confirmed that Jo-Jo had access to the burgundy Explorer described by the previous witnesses as being at the crime scene and later abandoned by where the gun was found. He also testified that George was also charged in the murder and was currently incarcerated.

After the admission of several State exhibits, Appellant made a Crim.R. 29 motion. The trial court denied the motion.

Appellant called George as his first witness and George invoked his Fifth Amendment right against self-incrimination; thus George did not provide any testimony. Appellant then rested his case without calling any other witnesses or presenting any evidence. Appellant later renewed his Crim.R. 29 and the trial court overruled the motion.

*State v. Alston*, No. 05CA008769, 2006 WL 2336627, at **2-7 (Ohio Ct. App., Aug. 14, 2006)

(footnotes omitted).  Factual determinations by state courts are entitled to a presumption of

correctness.  *House v. Bell*, 283 F.3d 37 (6th Cir. 2002).

### III.  Law and Standard of Review

This case is governed by provisions of the Antiterrorism and Effective Death Penalty Act

of 1996 ("the AEDPA") because Alston filed his habeas petition after the effective date of the

AEDPA.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The AEDPA requires that

habeas petitions be filed within one year of the latest of four triggering dates.  There is no

-11-

dispute as to the timeliness of Alston's petition in this case.

**A.  Procedural Prerequisites to Habeas Relief**

In addition to the statute of limitations, there are two potential procedural obstacles to habeas relief under the AEDPA: (1) failure to exhaust state court remedies and (2) procedural default.  Each of these procedural hurdles is discussed below.

*1.  Exhaustion*

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus.  28 U.S.C. § 2254(b) and (c); *Castillo v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. Macklin*, 936 F.2d 790, 793 (6th Cir. 1991).  If any state procedures for relief remain available, the petitioner has not exhausted state remedies.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

A petitioner must fairly present any claims to the state courts in a constitutional context to  exhaust state remedies.  *Anderson v. Harless*, 489 U.S. 4 (1982); *Picard v. Connor*, 404 U.S. 270 (1971); *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir. 1989).  "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."  *Picard*, 404 U.S. at 275; *see also Harris v. Reeves*, 794 F.2d 1168. 1174 (6th Cir. 1986).  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims. *Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).

Alston has no remaining state remedies for his claims.  Because Alston has no remaining state remedies, his claims have been exhausted.

*2. Procedural Default*

-12-

Reasons of federalism and comity generally bar federal habeas corpus review of

"contentions of federal law . . .  not resolved on the merits in the state proceeding due to

respondent's failure to raise them there as required by state procedure." *Wainwright v. Sykes*,

433 U.S. 72, 87 (1977).  The Supreme Court has stated the rule as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court
> pursuant to an independent and adequate state procedural rule, federal habeas review of
> the claims is barred unless the prisoner can demonstrate cause for the default and actual
> prejudice as a result of the alleged violation of federal law, or demonstrate that failure to
> consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

If the state argues that a petitioner has procedurally defaulted, the court must conduct a

four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether

the procedural default may be excused:

> First, the court must determine that there is a state procedural rule that is applicable to the
> petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the
> court must decide whether the state courts actually enforced the state procedural sanction.
> . . . Third, the court must decide whether the state procedural forfeiture is an  "adequate
> and independent" state ground on which the state can rely to foreclose review of a federal
> constitutional claim. . . . This question generally will involve an examination of the
> legitimate state interests behind the procedural rule in light of the federal interest in
> considering federal claims. . . . [Fourth, if] the court determines that a state procedural
> rule was not complied with and that the rule was an adequate and independent state
> ground, then the petitioner must demonstrate . . . that there was "cause" for him to not
> follow the procedural rule and that he was actually prejudiced by the alleged
> constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  A default also will be excused if the

petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of

justice."  *Coleman*, 501 U.S. at 750.

Respondent argues that Grounds Three, Four, Five, and Six are procedurally defaulted

and, therefore, should be dismissed.  The Court will address each of Respondent's arguments in

Section IV, below.

**B.  Merits Review**

When a petitioner has satisfied the procedural prerequisites, the AEDPA sets forth the

standard by which federal courts review the merits of a ground for federal habeas relief.  The

relevant provisions of the AEDPA provide as follows:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable
>> application of, clearly established Federal law, as determined by the
>> Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination
>> of the facts in light of the evidence presented in the State court
>> proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law can be determined only by examining the holdings of the

United States Supreme Court, as opposed to dicta.  *Williams v. Taylor*, 529 U.S. 362, 412

(2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  Nevertheless, an explicit

statement by the Supreme Court is not required; rather, "the legal principles and standards

flowing from [Supreme Court] precedent" also qualify as "clearly established law."  *Ruimveld*,

404 F.3d at 1010 (quoting *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)).  As the plain

language of the statute indicates, the inquiry is limited to decisions by the Supreme Court.

*Williams*, 529 U.S. at 412.  However, a habeas court "[m]ay look to lower courts of appeals'

decisions, not as binding precedent, but rather to inform the analysis of Supreme Court holdings

to determine whether a legal principle had been clearly established by the Supreme Court."

*Foley v. Parker*, No. 04-5746, 2007 WL 845864, at *2 (6th Cir. March 22, 2007) (citing *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413. A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* An incorrect state court decision may not be unreasonable under this standard. *Id.* at 410-11. For this reason, a federal habeas court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the federal court must determine that the state court decision is an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, No. 03-2113, 2006 WL 68438, at *4 (6th Cir. Jan.10, 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) ("[AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.")). The "unreasonable" requirement is a high bar. *Ruimveld*, 404 F.3d at 1010.

## IV.  Analysis

Respondent argues that Grounds One and Two of the petition are state-law claims that are not cognizable in a habeas petition and, therefore, should be dismissed. Respondent argues

that the remainder of Alston's claims – Grounds Three, Four, Five, and Six– are procedurally

defaulted and, alternatively, should be dismissed on the merits.  The Court reviews each of

Alston's grounds for relief in the order he has presented them.

**A.  Ground One**

In Ground One, Alston asserts that his conviction "was against the manifest weight of the

evidence."  A claim that a conviction is against the manifest weight of the evidence is a state-law

claim that is not cognizable in federal habeas review.  *Nash v. Eberlin*, 258 Fed. Appx. 761, 765,

n.4 (6th Cir. 2007); *Hess v. Eberlin,* 2006 WL 2090093 (S.D. Ohio 2006) (citing *Walker v.*

*Engle*, 703 F.2d 959, 969 (6th Cir.1983)).  Although Alston asserts Ground One as a "manifest

weight" claim, he actually argues the claim as a claim that the jury's verdict was not supported

by sufficient evidence.  (*See* Traverse, Doc. No. 24 at 31-33.)  Unlike "manifest weight claims,"

"insufficient evidence" claims are cognizable in habeas under the Fourteenth Amendment due

process clause.  *In re Winship*, 397 U.S. 358, 363-64 (1970).

As the law calls for "liberal and active construction of *pro se* claims for relief 'to

encompass any allegation stating federal relief,'" habeas courts have construed "manifest

weight" claims as "insufficient evidence" claims when circumstances so warrant.  *Nash v.*

*Eberlin*, 258 Fed. Appx. 761, 765, n.4 (6th Cir. Ohio 2007) (citations omitted).  In light of

Alston's *pro se* status and the fact that Alston argues Ground One as an "insufficient evidence"

claim, the Court will construe Ground One as an "insufficient evidence" claim.[4]

---

[4]This claim has been fairly presented to the state courts.  Under Ohio law, conviction
against the manifest weight of the evidence and conviction by insufficient evidence are
subject to two different legal standards:

> Although a verdict is supported by sufficient evidence, a court of appeals
> may nevertheless conclude that the verdict is against the manifest weight

-16-

The due process clause of the Fourteenth Amendment requires that a criminal conviction be based upon proof beyond a reasonable doubt as to every fact necessary to constitute the offense charged.  *In re Winship*, 397 U.S. 358, 363-64 (1970).  The standard for determining sufficiency of the evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 317 (1979).  In reaching its determination as to the sufficiency of the evidence, a court may not substitute its determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses.  *See id.*; *see also Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983).

Although Alston challenges his conviction with respect to all five crimes, his claim can be properly construed as challenging only his conviction with respect to aggravated robbery, murder, and felonious assault because he challenged only these convictions in his direct appeal

---

of the evidence. Here, the test [for a conviction against the manifest weight of the evidence] is much broader than that applicable to challenges to the sufficiency of the evidence. '* * * The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'  This review is tempered by the principle that questions of weight and credibility are primarily for the trier of fact.  Thus, the power to reverse must be exercised with caution and only in the rare case where the evidence weighs heavily against conviction.

*Ohio v. Banks*, 605 N.E.2d 219, 224-25 (Ohio Ct. App. 1992).  Although two different standards exist for determining whether a defendant was convicted against the manifest weight of the evidence and whether a defendant was convicted by insufficient evidence, a court finding that a conviction survives the broader manifest weight standard, must necessarily find that sufficient evidence existed for the defendant's conviction. Therefore, the claim that Alston was convicted by insufficient evidence was exhausted in the state courts, even though Alston presented a manifest weight claim.

-17-

to the state courts. *State v. Alston*, No. 05CA008769, 2006 WL 2336627, at *1, n.2 (Ohio Ct. App., Aug. 14, 2006) ("Appellant has not argued that his convictions for tampering with evidence and having weapons while under disability are against the manifest weight of the evidence; therefore, we will not address those convictions." ).  As Alston did not assert claims with respect to his convictions for tampering with evidence and having weapons while under disability in the state courts, he cannot raise them now because they would be barred by the doctrine of *res judicata*. *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998) (citing *State v. Combs*, 652 N.E.2d 205, 209 (Ohio Ct. App. 1994)) (holding that *res judicata* precludes post-conviction relief to address constitutional claims that could have been raised on direct appeal from the conviction and sentence).  Where a claim is barred by *res judicata*, a petitioner is considered to have waived the claim for federal habeas purposes "unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).[5]  Alston does not assert cause and prejudice with respect to his failure to raise these challenges to his tampering and weapons convictions; accordingly, these challenges are procedurally defaulted.

Alston was convicted of aggravated robbery, murder, and felonious assault.[6]  In asserting

---

[5]The Sixth Circuit has explicitly recognized *res judicata* as an adequate and independent basis for procedural default.  *Norris*, 146 F.3d at 332; *Rust*, 17 F.3d at 161.

[6]**§ 2911.01. Aggravated Robbery**
(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

  (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

that these convictions were not supported by substantial evidence, Alston cites the relevant law, but fails to discuss the facts and evidence or lack thereof in his case.  In his brief before the state appellate court, which this Court will assume sets forth the same basis for his challenge here, Alston argued that there was no evidence that a robbery actually occurred because there was no evidence that Alston and his co-defendant took any property from the victim.  However, § 2911.01 does not require that a theft actually occur; the statute is satisfied as long as there is an attempt to commit a theft offense.

Moreover, there was sufficient evidence from which the jury could have concluded that Alston and his accomplices committed an aggravated robbery.[7]   The victim's girlfriend testified

_____

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

**§ 2903.02. Murder**
(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

**§ 2903.11. Felonious Assault**
(A) No person shall knowingly . . .:

   (2) Cause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance.

[7]The state appellate court's opinion contains a footnote indicating that "the jury instructions included a conspiracy instruction for each charge."  *State v. Alston*, No., 2006 WL 2336627, at *2, n.3.  This Court has carefully reviewed the portion of the transcript in which the trial judge read the jury instructions to the jury.  The instructions contain no reference to conspiracy.  The trial judge did, however, instruct the jury on complicity as follows:

Under Ohio law, a person who aids and abets another person . . . can be

-19-

that a few minutes before she heard the gun shot, she heard the victim say "wait a minute Jo-Jo, you don't have to do it like this. I'll give you whatever you want." (Tr. 175-76.) She then found the victim lying in a pool of blood on the kitchen floor. (Id. at 178.) Sergeant Carpentiere testified that George Smith ("Smith") told Sergeant Carpentiere that the day before the incident, he purchased drugs that "weren't good" from the victim, planned on returning to the victim's house to get his money back, and that Alston and his co-defendant, Larry "Jo-Jo" Moore ("Jo-Jo"), "basically invited themselves along." (Id. 495.) Jeremiah Stewart testified that he was with Alston, Smith, and Jo-Jo when they were talking about carrying out a "lick plan," which he explained was a robbery plan, that they asked him to participate in the robbery, and that Smith told him that the victim was the target of the robbery. (Id. 534-36.)

With respect to the felonious assault, there was sufficient evidence that Jo-Jo –and Alston, under the theory of accomplice liability– "caused physical harm" to the victim "by means of a deadly weapon." In addition to the testimony recounted above, Jermaine and

---

charged either as a principle or in terms of complicity.

As to all the charges in the indictment, the Defendant is charged as a principal offender.

One who is an accomplice or in complicity may be regarded as if he was the principal offender, and one in complicity is considered just as guilty as the principle offender, and as if he personally performed every act constituting the offense.

* * *

Before one can be found guilty of an offense on the basis of his or her complicity, it must be proven that the one in complicity was aware of the design or purposes of the principle offender and shared in the knowledge held by the principle.

-20-

Jeremiah Stewart each testified that when they picked up Alston, Jo-Jo, and Smith from near the Gyro House, Alston said to Jo-Jo, "you shot him."  (*Id.* 412, 545.)  This testimony, together with the evidence that the victim died from a gunshot wound, constitutes sufficient evidence from which the jury could have concluded, beyond a reasonable doubt, that Jo-Jo and Alston caused physical harm to the victim by means of a gun.

The State also presented sufficient evidence to allow the jury to conclude, beyond a reasonable doubt, that Alston committed felony murder under the theory of accomplice liability. The felony murder statute is violated when an offender "causes the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree."  As discussed above, there was sufficient evidence that Alston committed aggravated robbery, a first degree felony, *see* § 2903.11(D), and felonious assault, a second degree felony, s*ee* § 2911.01(C).  As the victim died from a gunshot wound during the aggravated robbery, the jury could conclude beyond a reasonable doubt that Alston committed felony murder.

Having reviewed the trial transcript, this Court concludes that Alston's convictions for aggravated robbery, felony murder, and felonious assault were supported by sufficient evidence. The evidence detailed in the state appellate court's opinion was sufficient to allow a rational factfinder to find each element of aggravated robbery, felony murder, and felonious assault proven beyond a reasonable doubt, and the Court need not recount that evidence in detail here. *See infra* Section II.   Accordingly, Ground One should be dismissed.

## B.  Ground Two

In Ground Two, Alston claims that "the trial court committed reversible error and abused

its discretion when it refused to allow a jury instruction for the offense of reckless homicide."

While the Supreme Court has held that, in a capital case, it is a violation of due process for a

court to fail to instruct on a lesser included offense supported by the evidence, the Supreme

Court has not decided whether the rule applies in noncapital cases.  *Scott v. Elo*, 302 F.3d 598,

606 (6th Cir. 2002) (citing *Beck v. Alabama*, 447 U.S. 625, 627, 65 L. Ed. 2d 392, 100 S. Ct.

2382 (1980)).  The Sixth Circuit has held that it does not.  *Bagby v. Sowders*, 894 F.2d 792, 797

(6th Cir. 1990).

In *Bagby*, the Sixth Circuit held that a state court's failure to give a lesser included

offense instruction in a non-capital case "is not such a fundamental defect as inherently results in

a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair

procedure."  *Todd v. Stegal*, 40 Fed. Appx. 25, 28 (6th Cir. 2002) (citing *Bagby v. Sowders*, 894

F.2d at 797). The Sixth Circuit further held that the failure to give such an instruction may serve

as grounds for habeas relief only if "the state court so manifestly and flagrantly violated its own

clearly stated law in refusing the requested instruction, that the petitioner was denied due process

of law." *Todd v. Stegal*, 40 Fed. Appx. at 28 (citing *Bagby v. Sowders*, 894 F.2d at 794).  The

Sixth Circuit noted that "such occasions would be rare," and relief would be warranted under

such a theory only where "the failure to give the instruction amounts to a fundamental

miscarriage of justice likely to have resulted in the conviction of an innocent person."  *Id.*

To be entitled to relief on Ground Two, Alston must show that the state court violated

clearly established federal law in failing to instruct the jury on the lesser included offense of

reckless homicide.  Because the instant case is a non-capital case, there is no clearly established

federal law that required the state court to give such an instruction even if such an instruction

-22-

was warranted by the evidence.  Even assuming that the Sixth Circuit's holding in *Bagby* applies to non-capital cases and constitutes clearly established federal law, Alston would have to demonstrate that the state court "manifestly and flagrantly violated its own clearly stated law" and that the violation "amounts to a fundamental miscarriage of justice likely to have resulted in the conviction of an innocent person." *Todd v. Stegal*, 40 Fed. Appx. at 28.  Alston has not made such a showing.

The state appellate court's holding that the trial court did not err in failing to give a lesser included offense instruction was based on the following law and analysis:

> In his first assignment of error, Appellant has argued that the trial court erred in denying his request for a jury instruction on reckless homicide. Specifically, Appellant has argued that the trial court abused its discretion by not allowing the jury to consider reckless homicide as lesser included offense of murder. We disagree.

> When reviewing a trial court's jury instructions, this Court reviews the record to determine whether the trial court's decision to give or decline to give a requested jury instruction constitutes an abuse of discretion under the facts and circumstances of the case. *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140.

> Appellant has argued that he should have received a reckless homicide instruction as a lesser included offense of his felony murder charge. Pursuant to R.C. 2903.02(B), "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" The trial court instructed the jury that to convict Appellant of murder it must find that he caused the death of the victim "[a]s a proximate result of attempting to commit an offense of violence, to wit: Aggravated Robber[y], a felony of the First Degree, or Felonious Assault, a felony of the Second Degree[.]" The judge explained that cause is "an act or failure to act which, in the natural and continuous sequence, directly produces the physical harm to the person, and without which the harm would not have occurred." The judge continued: "[t]he Defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act. The Defendant is also

responsible for the natural and foreseeable results which follow in the ordinary course of events from the act or failure to act. There may be one or more cause of an event."

Pursuant to the instruction requested by Appellant, reckless homicide entails "recklessly caus[ing] the death of another[.]" R.C. 2903.041. A person acts recklessly "when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result[.]" R.C. 2901.22(C).

Determining whether the lesser included offense instruction was warranted is a two-step process. First we must decide if the proposed lesser included offense is actually a lesser included offense of the charged offense, then we review whether the instruction was required in the instant matter. An offense is considered to be a lesser included offense of another if:

"(i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense. *State v. Deem* (1988), 40 Ohio St.3d 205, 209, 533 N.E.2d 294.

Applying the *Deem* test, we find that reckless homicide is a lesser included offense of felony murder. *See State v. Berry*, 8th Dist. No. 83756, 2004 Ohio 5485, at P48; *see also, State v. McCurdy*, 1st Dist. No. C-020808, 2003 Ohio 5518, at P14. Specifically, pursuant to R.C. 2903.041, reckless homicide is a felony of the third degree, which carries a lesser penalty than felony murder. Next, one cannot cause the death of another under R.C. 2903.02(B) without also causing the death of another under R.C. 2903.041. Lastly, the mens rea/causation element of felony murder is clearly different than the mens rea of reckless homicide. As previously discussed, reckless homicide requires "a heedless indifference to the consequences" and a "disregard" of a known risk. While felony murder requires a "knowing" mens rea and an underlying felony that results in the death of the victim. See R.C. 2903.02(B). Based on the foregoing, we find that reckless homicide is a lesser included offense of felony murder. Accordingly, we must determine if the reckless homicide instruction was warranted in this case.

While a crime may constitute a lesser included offense, it does not follow that a lesser included offense instruction is mandatory; "[a]n instruction on a lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense." *State v. Carter* (2000), 89 Ohio St.3d 593, 600, 2000 Ohio 172, 734 N.E.2d 345. Moreover, the lesser included offense instruction is not warranted every time "some evidence" is presented to support the inferior

-24-

offense. *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272. Rather, a court must find "sufficient evidence" to "allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense." (Emphasis sic.). *Id*. at 632-633. In making the determination of whether the instruction was required, the reviewing court must view the evidence in a light most favorable to the defendant. *State v. Smith* (2000), 89 Ohio St.3d 323, 331, 2000 Ohio 166, 731 N.E.2d 645.

      Having reviewed the record and given the totality of the evidence, we cannot say that the jury could have reasonably acquitted Appellant of felony murder and found him guilty of the lesser included offense of reckless homicide. Accordingly, the trial court did not abuse its discretion by not giving the reckless homicide instruction. Appellant's first assignment of error lacks merit.

*State v. Alston*, 2006 WL 2336627, at **8-9.

      Based on the state appellate court's analysis, as well as Alston's failure to present any meaningful argument in support of his claim, the Court cannot say that the state court manifestly and flagrantly violated its own clearly stated law in failing to give the lesser included offense instruction and that its failure to do so resulted in the conviction of an innocent person. Accordingly, Count Two should be dismissed.

## C.  Ground Three

      In his amended third ground for relief, Alston claims that he "was denied due process and a fair trial when the trial court erred in admitting hearsay testimony, and admitting inadmissible evidence." Alston concedes that he never presented this claim to the Ohio courts. As he has no remaining state remedies available, these claims are exhausted. Because he could have raised them on direct appeal, but did not, they are barred by the doctrine of *res judicata. Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998) (citing *State v. Combs*, 652 N.E.2d 205, 209 (Ohio Ct. App. 1994)) (holding that *res judicata* precludes post-conviction relief to address constitutional claims that could have been raised on direct appeal from the conviction and

-25-

sentence).  Where a petitioner's claims are barred by *res judicata*, he is considered to have

waived them for federal habeas purposes "unless he can demonstrate cause for the procedural

default and actual prejudice resulting from the alleged constitutional error."  *Rust v. Zent*, 17

F.3d 155, 160 (6th Cir. 1994).   Therefore, to avoid dismissal of his claim, Alston must

demonstrate cause and prejudice.  In *Murray v. Carrier*, the Supreme Court outlined the contours

of what constitutes cause for a procedural default: "the existence of cause for a procedural

default must ordinarily turn on whether the prisoner can show that some objective factor external

to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v.*

*Carrier*, 477 U.S. 478, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986).

As "cause," Alston argues that he was "denied the right to have a copy of the transcripts

by counsel, and by the court as an indigent defendant."  Alston's asserted "cause" is

unpersuasive.  First, Alston was represented by counsel on direct appeal to the state appellate

court, and counsel failed to raise the claim at that time.  While Alston's lack of a transcript  may

be sufficient to excuse his failure to present the claim when he was proceeding *pro se*, it does not

explain his failure to present the claim on direct appeal before the state appellate court when he

was represented by counsel.[8]

Second, Alston fails to provide an adequate explanation as to why the lack of a transcript

prevented him from raising the claim when he was proceeding *pro se* in his appeal to the

Supreme Court of Ohio or in a 26(B) application.  Alston was present at his trial when the

---

[8]The Supreme Court has held that a defense counsel's inadvertent failure to raise a
substantive claim of error is insufficient to establish cause unless counsel was ineffective
under the Sixth Amendment.  *Murray v. Carrier*, 477 U.S. 478, 106 S. Ct. 2639, 91 L.
Ed. 2d 397 (1986).  Alston, however, did not properly raise a claim of ineffective
assistance of appellate counsel.

-26-

alleged errors were committed and while, without a transcript, he may not have been able to articulate the details of the alleged errors or cite to the transcript, he could have raised the errors at least in a general manner, as he has done in his habeas petition before this Court.

In addition to his failure to demonstrate cause, Alston fails to demonstrate prejudice. Although Alston makes a conclusory allegation that he "will show actual prejudice" and that denial of the claims in Ground Three "would result in a fundamental miscarriage of justice," he fails to articulate how he was prejudiced or explain why a fundamental miscarriage of justice would result from the denial of his claims. Accordingly, Ground Three should be dismissed as procedurally defaulted.

Alternatively, Ground Three should be dismissed on the merits. In support of Ground Three, Alston contends that he was denied due process and a fair trial because the trial court admitted hearsay testimony and inadmissible evidence. Alston's Amended Petition states the following supporting facts:

> The trial court allowed several witnesses testimony of co-defendant statements of several different stories of hearsay, when the witnesses testify that co-defendant told them to lie to the police before co-defendant and witnesses and their family members went to attorneys office and lie to the police several times. The trial court admitting parole officer testimony saying the defendant was currently on parole for robbery, and the trial court admitting inadmissible evidence in the trial court.

(Doc. No.8 at 6.)  Based on Alston's statement of supporting facts, it appears that with respect to the hearsay allegation, Alston refers to the testimony of Jeremiah and Jermaine Stewart that Smith asked them to lie to the police by telling the police that Smith left Yolanda Sullivan's house with Jeremiah and Jermaine Stewart, rather than with Alston and Larry "Jo Jo" Moore. (*See* Tr. at 552, 561-62.)  Jeremiah Stewart testified that he initially complied with Smith's

-27-

request and lied to the police, but when he realized the gravity of the matter and potential consequences of lying to the police, he told the police the truth.  (*Id.*)  Jermaine Stewart testified to the same.  (*Id.* 420-23.)

With respect to Alston's contention that the trial court admitted inadmissible evidence, Alston refers to the parole officer's testimony that he supervised Larry "Jo Jo" Moore on post-release control for robbery with a firearm specification, possession of cocaine, possession of drug paraphernalia, tampering with evidence, and carrying a concealed weapon (*See* Tr. at 473) and that he supervised Alston on post-release control for possession of drugs and robbery with a firearm specification (*See* Tr. at 474).

It is well-established that alleged trial court errors in the application of state procedure or evidentiary law, particularly regarding the admissibility of evidence, are generally not cognizable as grounds for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dep't. of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).  Instead, questions concerning the admissibility of evidence, as well as its probative or prejudicial value, are properly left to the sound discretion of the trial court.  *See Oliphant v. Koehler*, 594 F.2d 547, 555 (6th Cir. 1979); *Johnson v. Karnes*, 198 F.3d 589, 593 (6th Cir. 1999) ("[A]n inquiry as to whether evidence was properly admitted or improperly excluded under state law 'is no part of a federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'") (citations omitted). Only where the admission of the disputed evidence rendered the trial "so fundamentally unfair as to constitute a denial of federal rights" may it provide grounds for granting a writ of habeas

corpus. *Clemmons v. Sowders*, 34 F.3d 352, 356 (6th Cir. 1994).[9]

With respect to the testimony of Jeremiah and Jermaine Stewart that Smith asked them to lie to the police, that testimony was not hearsay and its admission was not erroneous.  Hearsay is defined as "a statement, other than one asserted by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Ohio Rule of Evidence 801(C).  The state argues that the statements were offered to explain why the witnesses changed their story to the police, not to prove that Smith asked the witnesses to lie to the police.  Accordingly, if the statements were not offered to prove the truth of the matter asserted, admission of the statements did not violate the hearsay rule.  Moreover, Alston has not shown that the admission of this evidence was introduced against him or had any impact on his conviction.  Alston has not demonstrated that admission of the testimony was an error of state law or that it rendered his trial fundamentally unfair such that he was denied due process.

Likewise, the admission of the parole officer's testimony is not a cognizable habeas claim, as it did not result in a due process violation.  The parole officer's testimony was admissible under state law because in Count Three of the indictment, Alston was charged with knowingly possessing a weapon while under disability in violation of Ohio Rev. Code § 2923.13. This charge was based on Alston's previous convictions for drug possession and robbery with a gun specification.  To prove an essential element of § 2923.13, the state was required to prove a prior felony conviction for an offense of violence or a drug offense.  The state did so by properly using the testimony of Alston's parole officer that he supervised Alston on post-release control

---

[9]With respect to state-law errors involving the admission of hearsay, such errors may be cognizable in habeas cases if they implicate the confrontation clause of the Sixth Amendment.

for drug possession and robbery.  (Tr. 473-74.)  *See, e.g.*, *State v. Twyford*, 763 N.E.2d 122, 144

(Ohio 2002); *State v. Ware*, No. 82644, 2004 Ohio App. LEXIS 1593, at *22 (Ohio Ct. App. Apr.

8, 2004) (holding that evidence of one prior conviction is necessary to prove a violation of ohio

Rev. Code § 2923.13, but where state presented evidence of two prior felony convictions, it was

harmless error because defendant did not show the evidence was misused to prove guilt on

felonious assault or attempted murder counts); *State v. Smith*, 589 N.E.2d 454, 457 (Ohio Ct.

App. 1990) (Where a "prior offense is an essential element of the crime charged . . . [evidence of

a prior conviction] is not only proper but required.").  Moreover, the trial court gave a limiting

instruction informing the jury that the purpose of the evidence was to indicate whether Alston

had prior convictions for offenses of violence or offenses involving drugs.[10]  (Tr. 476-77.)

Contrary to Alton's contentions, the admission of the testimony discussed above was not

erroneous under state law and did not render Alston's trial fundamentally unfair.  As Alston was

not denied due process, the claims in Ground Three are not cognizable in habeas.  Therefore,

Ground Three should be dismissed.

**D.  Ground Four**

In Ground Four, Alston claims that his "conviction for complicity to aggravated robbery

is based upon insufficient evidence."  Respondent argues that this claim is procedurally defaulted

and should be dismissed.  Alston concedes that he has procedurally defaulted this claim and seeks

---

[10]In addition, defense counsel never objected to this evidence.  Therefore, Alston waived
all but plain error.  *State v. Underwood,* 444 N.E.2d 1332, syllabus (Ohio 1983).  For the
reasons discussed above, no error occurred in the admission of this testimony or in the
trial court's limiting instruction.

to voluntarily dismiss it.[11]  (*See* Traverse, Doc. No. 24 at 20.)  Accordingly, the Court should

dismiss Ground Four.

**E.  Ground Five**

Ground Five states as follows: "Due process in appeal, denied fair opportunity to present

all issues, and denied fair review by the court."  Here, Alston raises an ineffective assistance of

appellate counsel claim, arguing that counsel failed to correspond with him, did not raise error on

appeal that should have been raised, waived oral argument, and withheld transcripts so that

Alston would be prevented from filing a 26(B) application.  (Doc. No. 8 at 7, Doc. No. 4 at 33-

35.)  Respondent argues that Alston first presented this claim in the state courts when he filed a

delayed 26(B) application and that he procedurally defaulted the claim when he failed to appeal

the denial to the Supreme Court of Ohio.  (Doc. No. 23 at 24.)

As "cause" for his failure to appeal to the Supreme Court of Ohio, Alston asserts that he

never received notice of the state appellate court's denial of the delayed 26(B) application.  (Doc.

No. 24 at 12, 15, 20.)  The state appellate court denied Alston's delayed 26(B) application on

May 17, 2007.  (Doc. No. 23, Ex. 18, Docket of Lorain County Clerk of Courts in Case Number

05CA008769.)  The following entry, dated May 18, 2007, appears on the Lorain County Clerk of

Courts docket in Alston's case: "A copy of journal entry sent to attorneys of record."  (*Id.*)  As

Alston filed the 26(B) application *pro se*, it is not clear to whom the notice was sent.  The record

contains no other evidence as to whether Alston was ever notified of the state appellate court's

judgment.  Assuming that Alston did not receive notice from the court, he became aware of the

---

[11]Despite Alston's voluntary dismissal of Ground Four, the Court has already concluded,
in its analysis of Ground One, that Alston's aggravated robbery conviction is supported
by sufficient evidence.

denial of his delayed 26(B) application at some point, but fails to explain when and how he actually became aware of it. He also fails to explain why he did not file a motion for delayed appeal to the Supreme Court of Ohio when he actually became aware of the denial. For these reasons, Alston has not demonstrated cause.

In addition, Alston has not demonstrated prejudice and the record does not support a finding of prejudice. To demonstrate prejudice, Alston must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Although Alston's reply brief states that he "will demonstrate that [the denial of the claim in Ground Five] would result in a fundamental miscarriage of justice," he fails to articulate any basis on which the Court can find a fundamental miscarriage of justice would result from the denial of his claim, and the record reflects no such basis.

As Alston has failed to satisfy the cause and prejudice test, and has failed to demonstrate a fundamental miscarriage of justice, Ground Five should be dismissed as procedurally defaulted.

**F. Ground Six**

Alston's sixth ground for relief states as follows:

The petitioner Alston's conviction is tainted and defective and his due process rights were violated in the defective indictment, in prosecution for aggravated robbery where the indictment omitted the required *mens rea* recklessness for the crime of aggravated robbery in violation of the Fourteenth Amendment of the United States Constitution.

In this claim, Alston argues that the indictment was defective because it failed to state the *mens rea* for robbery. Respondent argues that Alston has procedurally defaulted this claim and that the

-32-

claim lacks merit.[12]  The Court agrees.

Alston concedes that he has never presented a claim to the Ohio courts that his indictment was defective, but as cause for his failure to do so, asserts that the claim is based on a decision of the Supreme Court of Ohio that was issued while his federal habeas petition was pending, that is, *State v. Colon*, 885 N.E.2d 917 (Ohio 2008), decided on April 9, 2008.  (Doc. No. 25 at 4.)  For the reasons explained below, Alston's asserted cause is not well-taken.

In *Colon*, the defendant was convicted of robbery based on an "indictment [that] did not expressly charge the *mens rea* element of the crime of robbery."  *Id.* at 919.  The defendant argued on direct appeal that "his state constitutional right to a grand jury indictment and state and federal constitutional rights to due process were violated when his indictment omitted an element of the offense."  *Id.*  The state appellate court held that because the defendant did not raise the issue before his trial, he waived that claim pursuant to Ohio Criminal Rule 12(C)(2).[13]

The Supreme Court of Ohio reversed, holding that "when an indictment fails to charge a *mens rea* element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the trial court."  *State v. Colon*, 885 N.E.2d at 926.  The Supreme Court of Ohio reached this holding based on its conclusion that "an indictment that

---

[12]Alston raised this ground in an amended petition filed without leave *after* Respondent filed the Return of Writ.  Respondent does not argue that it should be dismissed on the ground that it was filed without leave or that leave should not be granted because of the late timing.

[13]Ohio Criminal Rule 12(C)(2) "states that defects in the indictment are waived if not raised before trial, except that failure to show jurisdiction in the court *or failure to charge an offense* may be raised at any time during the pendency of the proceeding."  *Id.* (emphasis added).

-33-

omits the mens rea element of recklessness fails to charge the offense of robbery, and is therefore an exception to the general rule stated in Crim. R. 12(C)."

Before holding that the defendant had not waived the defect in the indictment, the Supreme Court of Ohio concluded, and the state conceded, that the indictment was defective because it "failed to charge all the essential elements of the offense of and resulted in a lack of notice to the defendant of the mens rea required to commit the offense," and that, therefore, "[t]he defendant did not receive a constitutional indictment or trial." *Id*. at 924.  It is this aspect of the decision on which Alston bases his claim.  However, Alston's ability to present the claim that his indictment was defective was not dependent on the Supreme Court of Ohio's conclusion as to this issue, as it has been well-established, as a matter of constitutional law, that an indictment that fails to charge all the essential elements of a crime is defective.  *See, e.g. Hamling v. United States*, 418 U.S. 87, 117, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974); *Russell v. United States*, 369 U.S. 749, 765 (1962); *United States v. Middleton*, 246 F.3d 825, 841 (6th Cir. 2001). Accordingly, Alston could have raised the claim that his indictment failed to state the *mens rea* of robbery at any time before the decision in *Colon,* but failed to do so.  For the foregoing reason, Alston's asserted cause for his procedural default of Ground Six is not persuasive.

Moreover, Alston fails to demonstrate prejudice.  A defective indictment is subject to harmless error analysis, and the error in this case was harmless.  *See United States v. Cor-Bon Custom Bullet Co.*, 287 F.3d 576, 580 (6th Cir. 2002).  Although the indictment did not charge the *mens rea* element of robbery, the jury instructions included a *mens rea*.  Thus, the jury considered the defendant's *mens rea* as an element of the offense.[14]  Furthermore, Alston has not

---

[14]The jury was instructed to find, and did find, that "in attempting or committing a theft offense, or in fleeing immediately after such attempt or offense," Alston committed the

demonstrated that he is actually innocent. As Alston has not established cause and prejudice and has not demonstrated actual innocence, Ground Six should be dismissed as procedurally defaulted.

Having concluded that Ground Six is procedurally defaulted, the Court must address a final issue raised by Alston's recently filed reply to Respondent's Supplemental Return of Writ (Doc. No. 28). In that reply, Alston not only argues in support of his Ground Six claim, but also asserts an entirely new ground for relief – that trial counsel was ineffective for failing to object to the deficiency in the indictment. This newly asserted claim should be dismissed because, in addition to being filed without leave, it is procedurally defaulted. Alston has not presented the claim to the state courts. As he no longer has any available state remedies, the claim is exhausted. Because Alston could have raised the claim on direct appeal, but did not, it is barred by the doctrine of *res judicata*. *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998) (citing *State v. Combs*, 652 N.E.2d 205, 209 (Ohio Ct. App. 1994)) (holding that *res judicata* precludes post-conviction relief to address constitutional claims that could have been raised on direct appeal from the conviction and sentence). As Alston's claim is barred by *res judicata*, he is

---

acts set forth in § 2911.01(A)(1) (having a deadly weapon and displaying, brandishing, indicating possession of or using the deadly weapon) and § 2911.01(A)(3) (inflicting or attempting to inflict serious physical harm on another) with a "knowing" standard of culpability. In fact, the jury instructions set forth a standard higher than is required by Ohio law, as Ohio law requires only that the acts be committed with a *mens rea* of "recklessness." *State v. McSwain*, 607 N.E.2d 929, 932 (Ohio Ct. App. 1992); *State v. Crawford*, 461 N.E.2d 312, 315, n.1 (Ohio Ct. App. 1983); *see also State v. Colon*, 885 N.E.2d at 921 (concluding that "the state was required to prove . . . that the defendant 'recklessly' inflicted or attempted to inflict serious physical harm.") Thus, the trial court's failure to charge the *mens rea* of aggravated robbery in the indictment did not prejudice Alston, but rather benefitted him as it required the state to prove a greater degree of culpability than required by Ohio law. Accordingly, the error was harmless.

-35-

considered to have waived it for federal habeas purposes "unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  Alston has not demonstrated cause or prejudice. Although he makes a conclusory assertion that he is actually innocent (Doc. No. 24 at 20), he has not presented any evidence or argument demonstrating that he is actually innocent, and this Court finds no evidence in the record supporting a claim of actual innocence.  Accordingly, the newly raised claim of ineffective assistance of trial counsel should also be dismissed.

### IV.  Conclusion

For the foregoing reasons, the Magistrate Judge recommends Alston's habeas petition (Doc. No. 8, 25) be **DENIED**.

*/s/ Nancy A. Vecchiarelli*
United States Magistrate Judge

Date: July 24, 2008

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

-36-